No. 05-438

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 9

JANET REDIES,

        Plaintiff and Appellant,

   v.

ATTORNEYS LIABILITY PROTECTION SOCIETY
(A Mutual Risk Retention Group), a Montana
corporation, ROBERT TAMBLER, and
JOHN DOES 1-3,

        Defendants and Respondents.


APPEAL FROM:    The District Court of the Thirteenth Judicial District,
                   In and For the County of Yellowstone, Cause No. DV-2003-1281,
                   Honorable Gregory R. Todd, Presiding Judge


COUNSEL OF RECORD:

        For Appellant:

                L. B. Cozzens, Cozzens, Harman, Warren, Harris & Odegaard, P.L.L.P.,
                Billings, Montana

                James A. Manley, Manley Law Firm, Polson, Montana

        For Respondents:

                John E. Bohyer and Fred Simpson, Phillips & Bohyer, P.C.,
                Missoula, Montana


                      Submitted on Briefs:  June 7, 2006

                             Decided:  January 17, 2007

Filed:


_____
                    Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Janet Redies ("Redies") brought the instant action in the District Court for the Thirteenth Judicial District, Yellowstone County, against Attorneys Liability Protection Society, Inc., and four of its employees (collectively, "ALPS"). She alleged that ALPS had, two years earlier, engaged in unfair trade practices by failing to settle promptly the legal malpractice suit she had brought against John Kelly Addy ("Addy"), one of ALPS's insureds. Redies further alleged tortious breaches of statutory duties and the implied duty of good faith and fair dealing.

¶2      ALPS answered Redies' complaint and thereafter filed a motion for summary judgment, which the District Court granted. The court determined that ALPS had "a reasonable basis in law" under § 33-18-242(5), MCA, for contesting Redies' claims against Addy, that there were no genuine issues of material fact, and that ALPS was entitled to judgment as a matter of law. The court further determined that all other pending motions were moot. Redies timely appealed.

¶3      On appeal, Redies has framed a number of interrelated issues, all of which pertain to the following overarching question: Did the District Court err by granting ALPS's motion for summary judgment on the ground that ALPS had a reasonable basis in law for contesting Redies' claims against Addy?

¶4      In the course of answering this question, we address the following sub-issues raised by Redies: whether the reasonableness of ALPS's "basis in law" for contesting Redies' claims against Addy is a question of fact or a question of law; whether genuine issues of material fact remain, thus precluding summary judgment in this case; and,

2

lastly, whether Redies' "reasonable investigation" claim under § 33-18-201(4), MCA, survives a determination under § 33-18-242(5), MCA, that ALPS had a reasonable basis in law for contesting Redies' claims against Addy.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Conservatorship

¶5 Redies was involved in a bicycling accident on May 29, 1995, as a result of which she suffered a traumatic brain injury and was comatose for approximately two weeks. Consequently, Redies' mother, Rosalie Redies ("Rosalie"), and sister, Judy Uerling ("Uerling"), filed a petition in the District Court[1] for the appointment of a temporary conservator of Redies' estate. The court granted the petition on June 8, 1995, appointing C. A. Cosner ("Cosner"), a certified public accountant with whom the family already had a relationship, to serve in this capacity.

¶6 Redies emerged from her coma in mid-June 1995; however, she remained somewhat disoriented and unaware of her surroundings. Given her persistent incapacity, Rosalie and Uerling petitioned the District Court to make Cosner's appointment permanent. The court first appointed Vicki W. Dunaway ("Dunaway"), who had previously represented Redies in a number of matters, to represent Redies as "attorney ad litem" in conjunction with Rosalie and Uerling's petition. Following an investigation, Dunaway reported that Redies' mental condition, although somewhat improved, was still not to the level of being able to handle either her financial affairs or arrangements

---

[1]All of the proceedings discussed herein took place in the District Court for the Thirteenth Judicial District, Yellowstone County.

concerning her person. Accordingly, on September 6, 1995, the court appointed Cosner as permanent conservator, a capacity in which he served through April 25, 2000. (This conservatorship, incidentally, was the subject of a previous appeal to this Court. *See Redies v. Cosner*, 2002 MT 86, 309 Mont. 315, 48 P.3d 697.)

¶7 After his appointment as temporary conservator, Cosner learned that Redies owned significant assets, most of which were heavily encumbered; that she did not have any health insurance; and that she was incurring substantial medical costs due to her injuries. In June 1995, he applied for Medicaid benefits on Redies' behalf; however, the extent of her assets apparently disqualified her from receiving such benefits.

¶8 Cosner became concerned that Redies' mounting medical bills would quickly exceed all equity in her assets. Thus, immediately following his appointment as permanent conservator, he met with Uerling, Dunaway, and Addy to discuss Redies' financial situation and how best to conserve and manage her estate. Addy—who, as noted above, was an ALPS-insured attorney—was already involved in the case, having been retained by Cosner for legal advice concerning the management and administration of Redies' estate. Addy also had represented Uerling in an earlier dispute with Redies, which was fully resolved the previous year. *See Redies*, ¶ 5.

¶9 Cosner, Uerling, Dunaway, and Addy discussed a number of assets in Redies' estate and agreed that a management plan should be developed to maximize the amount of Redies' wealth that would be exempt from recapture by the government or the claims of creditors. Of particular relevance, Addy suggested that Cosner "pauperize" (in other words, impoverish) Redies by selling off most of her assets so that she could qualify for

4

and receive Medicaid payments for her supervised care. For instance, it was decided that Redies' twenty-acre parcel of land south of Red Lodge should be liquidated; that Cosner should dispose of Redies' five vehicles; and that Uerling should go into Redies' home and take anything Uerling thought she could use or that had significant sentimental value to her, particularly a knife set given to Redies by her father.[2] The possibility of filing a bankruptcy petition was also addressed, and Addy recommended that Rosalie's will be revised so that any bequest or devise to Redies would lapse in the event that she was still incapacitated at the time of Rosalie's death. That way, the bequest or devise would not end up going to creditors or the government under the recapture provisions of the Medicaid program.

¶10    Cosner proceeded to manage Redies' property according to the recommendations and decisions made at the September 6, 1995 meeting, selling real and personal property owned by Redies, putting the remaining personal property in storage, paying a number of Redies' debts, and seeking settlement with her remaining creditors. He successfully avoided bankruptcy and was able to negotiate forgiveness of approximately $123,000 in medical bills, after which Uerling (who had been appointed Redies' guardian at the same time Cosner was appointed Redies' conservator) qualified Redies for Medicaid and Social Security Supplemental Security Income ("SSI") coverage. Uerling also arranged medical care for Redies.

---

[2]These and other significant decisions reached by Addy, Cosner, Uerling, and Dunaway at the September 6, 1995 meeting were memorialized in a letter written by Addy to Cosner on September 7, 1995.

¶11    By 1998, Redies had made a significant recovery, and she began to question the disposition of her assets, as she was subsisting on SSI payments. Through new counsel, she sought an accounting of her assets and details regarding the management of her estate. Cosner and Uerling attempted to answer Redies' questions; however, each answer gave rise to new questions. The tone of the correspondence became adversarial, and Cosner and Uerling eventually filed petitions to terminate their respective roles as conservator and guardian. *See Redies*, ¶¶ 8-10. Litigation ensued, which ultimately culminated in Redies' previous appeal to this Court (which we decided May 2, 2002).

## II.    Redies v. Addy

¶12    Meanwhile, on or about July 9, 2001, Donald L. Harris ("Harris"), Redies' counsel at the time, notified Addy and Cosner of a complaint he was prepared to file on Redies' behalf. Among other things, Harris identified claims for negligence due to Addy and Cosner's failure, promptly after Redies' bicycling accident, to establish a trust to protect and preserve her estate. He also indicated that Redies preferred "to resolve this matter without filing a lawsuit if that is possible."

¶13    As it turns out, the parties were unable to negotiate a resolution, and Redies ended up filing a complaint in January 2002. The course of events during the period beginning in July 2001 and ending in December 2002—in particular, ALPS's refusal to settle Redies' claims against Addy both before and after she filed her complaint—formed the basis of her present unfair trade practices action against ALPS. Thus, it is necessary to set forth, in some detail, a number of the parties' communications and court filings during this period. Because negotiations over Redies' negligence claim against Cosner are not

6

relevant to the issues before us (notably, he was not named in the complaint she ultimately filed), the ensuing discussion focuses solely on the exchanges pertaining to Redies' claims against Addy.

¶14 On receipt of Harris's letter, Addy immediately notified ALPS, which undertook an investigation into the merits of Redies' claims. The record discloses a number of communications between ALPS and Addy and between ALPS and Harris, as well as research on Harris's part, during the latter half of 2001. In October, Harris obtained a professional opinion on whether a self-sufficiency trust (*see* §§ 53-18-101 to -105, MCA, and Admin. R. M. 37.2.501 to .513) could and should have been established following Redies' bicycling accident to conserve her assets. He was advised that, given Redies' disabling brain injury, her substantial medical bills, and her lack of health insurance, the establishment of a self-sufficiency trust would have qualified her for Medicaid while preserving her assets in a trust. He was further advised that income from the trust could have been used to supplement any needs not met by Medicaid or SSI (e.g., spending money, additional food and clothing, health services not otherwise covered, recreational needs).

¶15 Harris enclosed a copy of this report with a settlement demand to ALPS dated October 10, 2001. At the outset of his demand letter, he reiterated that "Ms. Redies hopes to settle her claims against Mr. Addy . . . without litigation." He then articulated the theory behind those claims: Under the circumstances that existed immediately following Redies' bicycling accident, Addy should have promptly recommended the establishment of a self-sufficiency trust for Redies. "Lawyers, in particular, are obligated

to know about the laws which are relevant to their client's case. . . . To diligently represent Ms. Redies, . . . [Addy] had a duty to do sufficient research to learn about the Montana Self Sufficiency Trust statutes." As a result of Addy's failure to do so, "Redies' estate was quickly depleted" and "[s]he now lives in poverty."

¶16 After receiving Harris's settlement demand, ALPS commissioned its own professional evaluation of Redies' claims. Among other things, the authors of the December 4, 2001 evaluation provided to ALPS discussed a possible statute of limitations defense and questioned whether Redies could have qualified as a beneficiary under the self-sufficiency trust provisions. They also questioned whether Redies could even bring this action against Addy, and they disputed the damages figures recited in the settlement demand. Ultimately, they concluded that "sufficient questions exist as to the issue of liability so that we believe it is not reasonably clear. At this point, unless the Plaintiff is willing [to] agree to a resolution of the case for an amount far below what their current demand is, we believe that a settlement conference would be of little value."

¶17 Of particular significance in the case at hand is the analysis of whether Redies could even bring the action against Addy. While positing, initially, that "absent a direct attorney-client relationship between [Redies] and [Addy], no action should be allowed," the authors of the evaluation went on to caution as follows:

> As you know, however, there have been challenges in the past as to this privity requirement. Most of the erosion of the concept has occurred in connection with beneficiaries of wills being allowed to sue the attorney for the testator. To our knowledge, Montana has not decided the issue of whether a protected person might be able to sue the attorney of the conservator. Clearly, she could sue the conservator. Presumably, the conservator would have a right over against his attorney. Thus, our court

8

may short circuit that process by simply finding that the relationship between the protected person and the conservator's attorney was close enough to allow suit.

Given these considerations, they concluded as follows:

> We do not put a great deal of stock in this privity defense, but it represents yet another problem the Plaintiff is going to experience in prosecuting her claim. Given sufficient time and effort, we believe that defense can be circumvented.

¶18 Within a week of receiving the foregoing report, ALPS notified Harris that it believed the case was defensible for the reasons stated in the December 4, 2001 evaluation and that it was rejecting Redies' settlement offer. Accordingly, Redies filed a complaint on January 2, 2002, stating negligence and breach of fiduciary duty claims against Addy.

¶19 Addy (represented by ALPS) answered the complaint and, on or about March 18, 2002, filed a motion for summary judgment. In his motion, Addy maintained that proof that an attorney-client relationship existed is "[e]ssential to a malpractice action"; that his only attorney-client relationships in this matter were with Cosner and Uerling; and that "no attorney-client relationship exists or ever has existed between Plaintiff Redies and Defendant Addy." Acknowledging that "[s]ome courts, in very limited situations, have extended the duty of an attorney to certain non-clients," he noted that this Court suggested this possibility in *Rhode v. Adams*, 1998 MT 73, 288 Mont. 278, 957 P.2d 1124. He then argued that if this Court were confronted with the question of whether an attorney owes a duty to a nonclient, we would adopt the multi-factor balancing test set forth in *Trask v. Butler*, 872 P.2d 1080, 1083 (Wash. 1994), and conclude that an attorney

9

retained by a conservator has no duty to the protected person. (We acknowledged the *Trask* balancing test in *Rhode* but found it inapplicable to the factual scenario before us. *See Rhode*, ¶ 17.)

¶20 On May 23, 2002, the District Court, Judge Baugh presiding, denied Addy's motion on the ground that factual and legal issues regarding the existence of an attorney-client relationship between Addy and Redies existed. It is not clear what negotiations between the parties, if any, immediately followed, but on or about October 11, 2002, Redies filed a motion for pretrial ruling asking the court to find, as a matter of law, that Addy owed her a duty of care when he rendered legal advice to Cosner concerning the management of her estate. Judge Baugh granted this motion on November 21, 2002, reasoning that "application of the *Trask* factors to the present case shows that Mr. Addy owed a duty to Ms. Redies when he rendered legal advice to the conservator, Mr. Cosner." In addition, the court determined that Redies was an "intended beneficiary" of Addy's advice to Cosner in light of § 72-5-427(3)(w), MCA.[3] Shortly thereafter, the parties settled the suit.

---

[3]Section 72-5-427(3)(w), MCA, provides as follows: "A conservator, acting reasonably in efforts to accomplish the purpose for which he was appointed, may act without court authorization or confirmation to . . . employ persons, including attorneys, auditors, investment advisors, or agents, even though they are associated with the conservator, to advise or assist him in the performance of his administrative duties; act upon their recommendation without independent investigation; and instead of acting personally, employ one or more agents to perform any act of administration, whether or not discretionary . . . ." (Paragraph break omitted.)

### III.    Redies v. ALPS

¶21    On December 9, 2003, Redies filed the instant action alleging, pursuant to § 33-18-242(1), MCA, that ALPS had violated § 33-18-201, MCA, during the foregoing negotiations in Redies v. Addy.  Specifically, with respect to the period (in 2001) before she filed her complaint, she alleged that Addy's liability to Redies "was reasonably clear"; that she had "made a good faith, prompt attempt to settle the claim"; and that ALPS, "without statement of any meritorious basis in fact or in law, denied the claim and refused to offer any amount to settle the claim," instead "embark[ing] upon a course and pattern of delay in the investigation, evaluation, and settlement of the claim, all of which was in bad faith."

¶22    Redies further alleged that after she filed her complaint in January 2002, ALPS "continued their pattern and course of delay and purposeful frustration of Plaintiff's rights," though "the liability of [Addy] was reasonably clear, and such liability was known to [ALPS] or would have been known upon reasonable investigation of all information available."  In addition to her unfair trade practices claim, Redies alleged, in two separate counts, tortious breaches of statutory duties (specifically, § 33-18-201, MCA) and the implied duty of good faith and fair dealing.

¶23    ALPS answered Redies' complaint and, on October 25, 2004, filed a motion for summary judgment on the ground that "[a]t all times during the pendency of the underlying case against [Addy] . . . , ALPS had a 'reasonable basis in law' for contesting Redies's claim"—namely, "that as the attorney for a conservator, [Addy] did not owe a professional duty of care to Redies, the protected person in a conservatorship

11

proceeding." Taking advantage of language in *Watkins Trust v. Lacosta*, 2004 MT 144, 321 Mont. 432, 92 P.3d 620, which we had decided in the interim (on June 8, 2004), ALPS asserted that the defense it had maintained on Addy's behalf in the underlying action was "rock solid (and ALPS was entitled to rely upon it) because Montana law did not recognize a professional duty running from the lawyer for a conservator to a **non**-client beneficiary such as Redies." (As discussed below, we noted in *Watkins Trust* that "[t]he duty owed [by an attorney] to a nonclient beneficiary is a matter of first impression in Montana." *Watkins Trust*, ¶ 21 (citing *Rhode*, ¶¶ 12-13).)

¶24 The District Court, Judge Todd presiding, agreed with ALPS, reasoning that "not until 2004, when the Montana Supreme Court issued its opinion, in a case of first impression, were Montana attorneys held to owe duties to non-client beneficiaries." The court acknowledged our statement in *Rhode* that "a multi-factor balancing test, such as that set out in *Trask*, may be effective when used to address the duties of attorneys *in transactional matters or estate planning and probate practice*." *Rhode*, ¶ 17 (emphasis added). However, the court decided that the *Trask* test was *not* applicable to the case at hand because "an adversarial situation" existed between Redies and Uerling, which precluded the imposition of a fiduciary duty running from Addy to Redies during the months immediately following Redies' accident (citing *Rhode*, ¶ 17).[4]

---

[4]As discussed earlier, Judge Baugh reached the opposite conclusion in the underlying action (Redies v. Addy), determining that "it is appropriate for the Court to apply the *Trask* factors to the present case." Likewise, Judge Baugh determined in the underlying action that "when Mr. Addy rendered legal advice to Mr. Cosner, there was no conflict of interest between Mr. Addy, Mr. Cosner, and Ms. Redies." The contrary rulings by Judge Baugh and Judge Todd implicate the doctrine of res judicata; however,

¶25 Having determined that at the time of the alleged malpractice, Addy did not owe a duty to third-party beneficiaries such as Redies, the court concluded that "ALPS had a reasonable basis in law for the denial of and defense against Redies' claim" and that no genuine issues of material fact remained. Accordingly, the court granted ALPS's motion. Notably, Judge Todd did not rule on a M. R. Civ. P. 56(f) motion filed by Redies on November 30, 2004, except to say that "[t]his order renders all other motions in the cause of action moot."

## STANDARD OF REVIEW

¶26 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Cole v. Valley Ice Garden, L.L.C.*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. Rule 56(c) provides that a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Because summary judgment is an extreme remedy which should not be a substitute for a trial on the merits if a controversy exists over a material fact, "the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment." *Prindel v. Ravalli County*,

---

though Redies mentions "issue preclusion" in her opening brief, she does not develop the issue. Thus, we do not address it further. *See In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6 ("[W]e will not consider unsupported issues or arguments."); M. R. App. P. 23(a)(4).

2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19 (internal quotation marks omitted); *In re Dorothy W. Stevens Revocable Trust*, 2005 MT 106, ¶ 13, 327 Mont. 39, ¶ 13, 112 P.3d 972, ¶ 13; *see also Hi-Tech Motors v. Bombardier Motor Corp.*, 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32 (explaining the process by which a motion for summary judgment is evaluated).

## DISCUSSION

### I.   The Reasonable Basis in Law Defense

¶27   As noted above, Redies brought the instant action under the statutory provisions which prohibit unfair trade practices by insurance companies.  Specifically, § 33-18-242(1), MCA, creates an independent cause of action by an insured or a third-party claimant against an insurer "for actual damages caused by the insurer's violation of subsection (1), (4), (5), (6), (9), or (13) of 33-18-201."  Redies' complaint does not specify any particular subsections of § 33-18-201, MCA; however, on appeal she and ALPS confine their respective arguments to subsections (4) and (6), which provide as follows:

> No person may . . . do any of the following: . . . (4) refuse to pay claims without conducting a reasonable investigation based upon all available information; . . . (6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; . . . .

Section 33-18-201(4), (6), MCA (paragraph breaks omitted).

¶28   An insurer, however, is not liable under § 33-18-242, MCA, if it had "a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue."  Section 33-18-242(5), MCA.  An insurer asserting this affirmative defense has

14

the burden of establishing it by a preponderance of the evidence. *Watters v. Guaranty Nat. Ins. Co.*, 2000 MT 150, ¶¶ 65, 67, 300 Mont. 91, ¶¶ 65, 67, 3 P.3d 626, ¶¶ 65, 67, *overruled in part on other grounds, Shilhanek v. D-2 Trucking, Inc.*, 2003 MT 122, ¶ 21, 315 Mont. 519, ¶ 21, 70 P.3d 721, ¶ 21. ALPS invoked the reasonable basis "in law" portion of § 33-18-242(5), MCA, as a defense to Redies' claims against it.

¶29 To determine whether an insurer had "a reasonable basis in law . . . for contesting the claim or the amount of the claim," it is necessary first to survey the legal landscape as it existed during the relevant time period. *See Shilhanek*, ¶¶ 24-31. Thus, we must step into ALPS's shoes during the communications and negotiations which took place from July 2001 (when Redies, through Harris, first presented Addy with her claims against him) through December 2002 (when the parties finally settled those claims). We then determine, from this perspective, whether the defense proffered by ALPS—namely, that an attorney retained by a conservator does not owe a duty to the protected person—was, at that time, "a reasonable basis in law" for contesting Redies' claims. Before doing so, however, it is necessary first to address the parties' dispute over whether this issue presents a question of fact or a question of law.

## II.    Question of Fact or Question of Law

¶30 In *Dees v. American Nat. Fire Ins. Co.*, 260 Mont. 431, 861 P.2d 141 (1993), then-Justice Gray expressed the view that

> [b]ecause reasonableness is a question of fact, it is for the trier of fact to weigh the evidence and judge the credibility of the witnesses in determining whether the insurer had a "reasonable basis" for denying a claim. Thus, such determinations generally must be based on the facts and circumstances of each case.

15

*Dees*, 260 Mont. at 452, 861 P.2d at 154 (Gray, J., joined by Turnage, C.J., and Nelson, J., specially concurring). We later adopted this proposition in *Dean v. Austin Mut. Ins. Co.*, 263 Mont. 386, 869 P.2d 256 (1994), where we stated as follows:

> [R]easonableness is generally a question of fact; therefore, it is for the trier of fact to weigh the evidence and judge the credibility of the witnesses in determining whether the insurer had a "reasonable basis" for denying a claim. This is not a determination that can be made "as a matter of law," as requested by the Deans and by Austin Mutual. Rather, whether an insurer has a reasonable basis in law or in fact for contesting a claim or the amount of a claim is to be determined as any other disputed issue of fact based upon the evidence and circumstances of each case.

*Dean*, 263 Mont. at 389, 869 P.2d at 258 (citing the special concurrence in *Dees*); *accord DeBruycker v. Guaranty Nat. Ins. Co.*, 266 Mont. 294, 298, 880 P.2d 819, 821 (1994).

¶31 The following year, however, in *Watts v. Westland Farm Mut. Ins. Co.*, 271 Mont. 256, 895 P.2d 626 (1995), we determined that *Dean*'s trier-of-fact rule did not apply when there was no insurance policy in effect at the time the injury occurred. *See Watts*, 271 Mont. at 263, 895 P.2d at 630 ("[T]here can be no genuine issues of material fact concerning [the insurers'] obligations for damage to the cantaloupe crop" given that "the binder that temporarily insured the cantaloupe was not in effect at the time of the July 18, 1993 hailstorm."). This same exception controlled our disposition of an unfair trade practices claim in *Bartlett v. Allstate Ins. Co.*, 280 Mont. 63, 70, 929 P.2d 227, 231 (1996) ("Bartlett did not have an insurable interest in the property and, on that basis, Allstate clearly had a reasonable basis for not paying Bartlett's claim for insurance proceeds.").

16

¶32    We later acknowledged a second exception to the trier-of-fact rule. In *Watters*, we reasoned that the rule "is not necessary in a summary judgment proceeding where the underlying 'basis *in law*' [for contesting the claim or the amount of the claim] is grounded on a legal conclusion, and no issues of fact remain in dispute." *Watters*, ¶ 69 (emphasis added). Thus, we determined in *Watters* that it was for the court, not the trier of fact, to determine whether the applicable legal precedent provided an absolute defense as a matter of law. *Watters*, ¶ 69.

¶33    In the case at hand, Redies maintains that neither of the two exceptions to the trier-of-fact rule applies in this case and, therefore, that the reasonableness of ALPS's decision to contest her claims against Addy is a question of fact, thus precluding summary judgment. There is no dispute that Addy, in fact, was insured by ALPS at the time of the alleged malpractice; thus, Redies focuses on the second exception to the rule. Seizing on language in *Watters*—specifically, our observation that the case law on which the insurer had relied was "legally conclusive" as to the disposition of the Watters' claim against its insured, *Watters*, ¶ 72—she argues that unless there was "legally conclusive" law establishing that the insurer had *no* obligation to pay the claim, the "reasonable basis in law" issue must go to the trier of fact. And since there was no "legally conclusive" law in Montana establishing that a lawyer retained by a conservator does *not* owe a duty to the protected person, she concludes that the reasonableness of ALPS's decision to contest her claims on this ground is a factual issue for a jury to decide.

¶34    Redies' narrow interpretation of the second exception to the trier-of-fact rule is incorrect. To be sure, we noted in *Watters* that *Juedeman v. National Farmers Union*,

253 Mont. 278, 833 P.2d 191 (1992), as "the lone precedent from Montana case law upon which [the insurer] could rely under the circumstances," was "legally conclusive to the extent there was simply no other authority in Montana at the time." *Watters*, ¶¶ 71, 72. This was not to say, however, that whenever the insurer's decision to contest a claim is not sustained by "legally conclusive" law, the issue of reasonableness must go to the trier of fact. Rather, our reasoning centered on the fact that the insurer's basis in law for contesting the claim was "grounded on a legal conclusion." *See Watters*, ¶ 69.

¶35 Accordingly, we now clarify that while the assessment of reasonableness generally is within the province of the jury (or the court acting as fact-finder), *Dean*, 263 Mont. at 389, 869 P.2d at 258, reasonableness is a question of law for the court to determine when it depends entirely on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents. This distinction not only reflects the principle that the jury does not decide or determine the law, *see* § 25-7-102, MCA, but also honors the relevant language of the statute at issue, *see* § 33-18-242(5), MCA ("An insurer may not be held liable under this section if the insurer had a reasonable basis *in law* . . . for contesting the claim or the amount of the claim." (emphasis added)).

## III. The Legal Landscape

¶36 Turning now to the relevant legal landscape, we must, as explained above, determine whether the defense proffered by ALPS on Addy's behalf—namely, that an attorney retained by a conservator does not owe a duty to the protected person—was "a reasonable basis in law" for contesting Redies' claims in 2001 and 2002.

## A. First-Party Relationship between Addy and Redies

¶37 Redies argues briefly that Addy acted not only as attorney for Cosner, but also as attorney for Redies. In essence, she suggests that Addy held himself out as her attorney and, thus, that there was an attorney-client relationship between them. Similarly, Justice Cotter's Dissent articulates a credible argument that an attorney-client relationship exists between a protected person and the attorney retained by the protected person's conservator to render legal advice concerning the administration of the estate. Although the Dissent does not use the term, it apparently is of the view that the protected person and the attorney are in "privity of contract."[5] From this, the Dissent maintains that "Redies was Addy's client."

¶38 Redies' and the Dissent's arguments, however, overlook the issue at hand, which is whether ALPS had a reasonable basis in law for contesting Redies' claims. To answer this question, we must survey the legal landscape as it *actually* existed during the parties' negotiations. In this regard, neither Redies nor Justice Cotter's Dissent cites any Montana authority establishing, or even intimating, that an attorney retained by a conservator represents the protected person. Had such authority existed at the time ALPS contested Redies' claims, this would be a different case. As it is, however, Redies and the Dissent seem to be faulting ALPS for contesting a theory of liability—namely, that Redies was Addy's client—which Redies and the Dissent believe is compelling but which, nevertheless, was an open question in Montana in 2001 and 2002. (Incidentally,

---

[5]"Privity of contract" refers to "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so." *Black's Law Dictionary* 1217 (Bryan A. Garner ed., 7th ed., West 1999).

19

Redies raised this same theory in the District Court, but her primary argument was that an attorney owes a duty of care to certain *third* parties such as herself.) Such an approach misplaces the focus of our inquiry, which is not on whether we agree with the plaintiff's theories of liability in the underlying suit but, rather, whether the insurer's grounds for contesting those theories were reasonable under the existing law.

## B. Third-Party Relationship between Addy and Redies

¶39 In addressing the issue of whether its defense in the underlying suit was "a reasonable basis in law" for contesting Redies' claims, ALPS relies heavily on language in *Watkins Trust v. Lacosta*, 2004 MT 144, 321 Mont. 432, 92 P.3d 620. Specifically, ALPS points out that in *Watkins Trust*, we noted that "[t]he duty owed [by an attorney] to a nonclient beneficiary is *a matter of first impression* in Montana." *Watkins Trust*, ¶ 21 (emphasis added) (citing *Rhode v. Adams*, 1998 MT 73, ¶¶ 12-13, 288 Mont. 278, ¶¶ 12-13, 957 P.2d 1124, ¶¶ 12-13). According to ALPS, based on this language, "the scope of Addy's legal duty was undecided . . . until *Watkins Trust* was decided on June 8, 2004"; thus, contesting Redies' claims on the ground that Addy owed no legal duty to Redies "was reasonable as a matter of law."

¶40 Yet, when ALPS was investigating and negotiating Redies' claims in 2001 and 2002, the foregoing "first impression" language of *Watkins Trust* did not yet exist. The reasonableness of ALPS's decision to contest Redies' claims on the ground that Addy owed her no duty must be evaluated within the context of our then-existing precedents, not something we said in a later decision. *See Graf v. Continental Western Ins. Co.*, 2004 MT 105, ¶ 17, 321 Mont. 65, ¶ 17, 89 P.3d 22, ¶ 17 ("The [Unfair Trade Practices Act]

20

standards focus on what the insurer knows at a particular point in time—before trial, during the investigative settlement stage.").

¶41 Likewise, just because the scope of Addy's duty may have been "undecided" in 2001 and 2002, it does not *necessarily* follow that ALPS's decision to contest Redies' claims against Addy was reasonable. It seems that in ALPS's view, a legal theory for contesting a claim is reasonable *per se* so long as this Court has not yet explicitly rejected it—even if the theory has been called into serious question by then-existing precedents. We reject this interpretation of the statutory scheme, which turns reasonableness on its head and runs contrary to the public policy of Montana to encourage settlement and avoid unnecessary litigation, *see Watters*, ¶ 57. To be sure, a tort defendant and his or her insurer should, as ALPS submits, be able to test the scope and boundaries of legal duties, remedies, and defenses; but, at the same time, an insurer should not be immune from liability under § 33-18-242(1), MCA, as Redies points out, simply because this Court had not yet *explicitly* rejected the legal proposition on which the insurer relied in the underlying action. This is precisely the point of evaluating the "reasonableness" of the insurer's proffered defense. *Cf. Graf*, ¶¶ 16-18 (rejecting the proposition that a defense verdict in the underlying action provides, as a matter of law, a reasonable basis defense to a subsequent Unfair Trade Practices Act ("UTPA") claim, since such a rule would promote the claim settlement abuses the UTPA was designed to deter—e.g., by encouraging insurers to obtain defense verdicts in the underlying suit at any cost).

¶42 In this regard, although *Watkins Trust* was the first instance in which we explicitly held that an attorney owed a duty to a nonclient third party—specifically, we held that a

21

drafting attorney owes a duty to nonclient beneficiaries named in the drafted instrument, *see Watkins Trust*, ¶¶ 21-22—our decision was not the watershed event suggested by ALPS and the District Court. Rather, our holding was an extension of existing precedents. Indeed, we observed that

> a finding of duty is *consistent with existing Montana law*. This Court has noted that a multi-factor balancing test adopted in other jurisdictions may be appropriate in deciding the duty owed by attorneys to nonclients in estate planning. *Rhode*, ¶ 17. Additionally, we have recognized liability to nonclients in other professional contexts. *See*, *e.g.*, *Thayer v. Hicks* (1990), 243 Mont. 138, 793 P.2d 784 (accounting firm liable to nonclient); *Jim's Excavating Serv. v. HKM Assoc.* (1994), 265 Mont. 494, 878 P.2d 248 (professional engineer liable to nonclient); *Turner v. Kerin & Assoc.* (1997), 283 Mont. 117, 938 P.2d 1368 (professional engineer liable to nonclient).

*Watkins Trust*, ¶ 22 (emphasis added).

¶43 Accordingly, the determinative question is whether this progression in our case law toward holding an attorney liable to certain nonclients had, by the time Redies stated her claims against Addy, reached the point at which ALPS's assertion that he owed her no duty no longer constituted "a reasonable basis in law" for contesting her claim.

¶44 The starting point for answering this question is *Rhode*, in which we signaled that an attorney may owe a duty to nonclients in some contexts. Specifically, after noting that we had not before discussed "whether an attorney owes a duty to third persons to exercise care in the performance of services for his or her client," *Rhode*, ¶ 12, we went on to state that such a duty may arise in some contexts, but not where the attorney is representing a client in adversarial proceedings (as was the case in *Rhode*), *Rhode*, ¶ 17. We further indicated that "a multi-factor balancing test, such as that set out in [*Trask v. Butler*, 872

P.2d 1080, 1083 (Wash. 1994)], may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice." *Rhode*, ¶ 17. Thus, as of our decision in *Rhode* in 1998, it was clear that an attorney *may* owe a duty to nonclients in some nonadversarial contexts and that the *Trask* multi-factor balancing test *may* be effective for ascertaining the existence of such a duty.

¶45 Redies suggests that the question of whether an attorney owes a duty to nonclients was not as unsettled as the foregoing language in *Rhode* implies. She argues that "[l]ong before any claim was asserted against Mr. Addy, this Court had effectively discarded the outdated 'privity of contract' concept." In support of this proposition, she directs our attention to the three other cases identified in ¶ 22 of *Watkins Trust*—namely, *Thayer*, *Jim's Excavating*, and *Turner*—in which we recognized the existence of a duty to nonclients in a number of professional contexts.

¶46 In *Thayer*, we addressed the extent to which an accountant owes a duty of care to third parties with whom he is not in privity. After discussing three different approaches by which courts determine the extent of an accountant's duty of care to nonclients, *Thayer*, 243 Mont. at 144-46, 793 P.2d at 788-89, we held that "an accountant may owe a duty of care to third parties with whom he is not in privity of contract," but "this duty exists only if the accountant actually knows that a specific third party intends to rely upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product," *Thayer*, 243 Mont. at 149, 793 P.2d at 791.

¶47 Next, in *Jim's Excavating*, we addressed whether an engineering firm could be held liable to a contractor with whom it was not in contractual privity. HKM, the engineering firm, argued that an engineer only has a duty to the party with whom it has contracted. *Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 252. We rejected this contention, noting that HKM's argument "ignores the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort." *Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253 (citing *Hawthorne v. Kober Const. Co., Inc.*, 196 Mont. 519, 640 P.2d 467 (1982), and *Tynes v. Bankers Life Co.*, 224 Mont. 350, 730 P.2d 1115 (1986)). We went on to hold that "a third party contractor may successfully recover for purely economic loss against a project engineer or architect when the design professional knew or should have foreseen that the particular plaintiff or an identifiable class of plaintiffs were at risk in relying on the information supplied." *Jim's Excavating*, 265 Mont. at 506, 878 P.2d at 255.

¶48 Finally, in *Turner*, we considered whether one who succeeds to a mortgagee's security interest in real property could state a cause of action against a third party for damages to that property which impair his or her security interest. Based on a passage from Prosser, *The Law of Torts* § 93 (4th ed., West 1971), which we had also relied on in *Jim's Excavating*, we reasoned that "by contracting with the owners to perform engineering work on the property, Kerin placed itself in a relation toward any party who held a security interest in the property that the law imposed upon him an obligation, sounding in tort and not in contract, to act in such a way that the security interest would not be injured." *Turner*, 283 Mont. at 126, 938 P.2d at 1374. Accordingly, we held that

24

"a person who, subsequent to the damage to the property, acquires a pre-existing security interest in the property can maintain a cause of action for impairment of that security interest to the extent of the outstanding debt." *Turner*, 283 Mont. at 127, 938 P.2d at 1374.

¶49 Relying on these cases, Redies asserts that this Court "abolished the old 'privity of contract' requirement that formed the basis of ALPS' 'no privity' defense." Similarly, Justice Nelson's Dissent points out that this Court called the privity concept into doubt twenty years before ALPS relied on this defense to Redies' claims against Addy. Specifically, we stated in *Hawthorne* that "[w]e view privity to be a concept having proper application in the area of contract law. There seems to be no sound public policy argument for extending its application to tort." *Hawthorne*, 196 Mont. at 523, 640 P.2d at 469.

¶50 We agree with both Redies and Justice Nelson's Dissent that *Hawthorne*, *Tynes*, *Thayer*, *Jim's Excavating*, *Turner*, and *Rhode* reflected the demise of the "privity of contract" requirement historically imposed upon a plaintiff seeking to hold a defendant liable for professional malpractice. Indeed, we indicated in *Jim's Excavating* that this requirement had been "abolish[ed]." *See Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253 (referring to "the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort"). However, none of these cases abolished the requirement that a plaintiff in a professional malpractice action first prove that the defendant owed her a duty of care, as Justice Nelson's Dissent ably demonstrates with respect to attorneys. *See* ¶¶ 86-87 (citing *Carlson v. Morton*, 229 Mont. 234, 238, 745

25

P.2d 1133, 1136 (1987); *Lorash v. Epstein*, 236 Mont. 21, 24, 767 P.2d 1335, 1337 (1989); *Merzlak v. Purcell*, 252 Mont. 527, 529, 830 P.2d 1278, 1279 (1992); and *Hauschulz v. Michael Law Firm*, 2001 MT 160, ¶ 11, 306 Mont. 102, ¶ 11, 30 P.3d 357, ¶ 11). In other words, the mere absence of a privity requirement does not render a professional liable for the negligent performance of a contract to any and all third parties. To the contrary, in recognizing tort liability in the absence of privity, we have concomitantly limited the class of plaintiffs to identifiable third parties (typically, those who are known or are reasonably foreseeable by the professional, *see Thayer*, 243 Mont. at 149, 793 P.2d at 791; *Jim's Excavating*, 265 Mont. at 506, 878 P.2d at 255).

¶51 In this regard, Justice Nelson's Dissent points out that by 2001, at least three different approaches existed in our case law for ascertaining the duty of care owed by a professional to third parties—namely, the rule enunciated by Prosser and applied by this Court in *Hawthorne*, *Tynes*, *Jim's Excavating*, and *Turner*; the approach we took in *Thayer*; and the *Trask* multi-factor balancing test set forth in *Rhode*. *See* ¶¶ 89-92. Yet, we had not adopted any of these approaches with respect to attorneys specifically. Moreover, we signaled in *Rhode* that the *Trask* test, in particular, may be effective for this purpose. *Rhode*, ¶ 17.

¶52 Thus, the circumstances and extent of any duty owed by an attorney to a nonclient was not nearly as well-defined as Redies and Justice Nelson's Dissent suggest it was during the period in which ALPS contested Redies' claims against Addy. We acknowledged in *Rhode* that we had never before addressed whether an attorney, specifically, owes a duty to third persons to exercise care in the performance of services

for his or her client. *Rhode*, ¶ 12. And we left this issue unresolved with respect to nonadversarial situations, stating merely that "a multi-factor balancing test, such as that set out in *Trask*, *may* be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice." *Rhode*, ¶ 17 (emphasis added). Given this equivocal language, the question of whether an attorney retained by a conservator owed a duty to the protected person was unsettled in 2001 and 2002. Notably, Redies concedes as much by pointing out that until *Watkins Trust*, there was no "legally conclusive" law in Montana establishing that a lawyer retained by a conservator does or does not have a duty to the protected person. We therefore reject the contention that the law in Montana was decidedly against ALPS's position.

## IV.   Application

¶53    As explained above, it was clear as of our decision in *Rhode* that an attorney *may* owe a duty to nonclients in some nonadversarial contexts and that the *Trask* multi-factor balancing test *may* be effective for ascertaining the existence of such a duty. Not surprisingly, therefore, Addy (represented by ALPS) addressed the *Trask* test at length in his motion for summary judgment in Redies v. Addy. After pointing out that a plaintiff in a legal malpractice action "must establish that the professional owed him a duty of care," he acknowledged that "[s]ome courts . . . have extended the duty of an attorney to certain non-clients." He then asserted that "[a]lthough the Supreme Court has not unequivocally adopted the multi-factor balancing test, it is clear that even if it was applied, there would be no liability to Janet Redies under these circumstances."

27

¶54 In *Rhode*, we listed the six factors which comprise the *Trask* balancing test: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability. *See Rhode*, ¶ 14. Applying these factors, Addy argued that Redies was an "incidental beneficiary" of his attorney-client relationship with Cosner; that he "had no authority to act on his own with regard to [Redies' estate]" and, thus, Redies' action should be directed against Cosner, the conservator, who was "[t]he only person with that legal authority"; and that public policy considerations counseled against finding a duty in this case because "[t]o hold Mr. Addy had duties to Janet Redies in addition to those of Mr. Cosner would create an irresolvable conflict of interest and division of loyalties for him."

¶55 Given our decision in *Watkins Trust*, the foregoing argument is now of dubious merit. However, we cannot say that it was unreasonable *at the time it was made*. Given that we had signaled in *Rhode* that the *Trask* multi-factor balancing test may be effective for ascertaining the existence and scope of the duty owed by an attorney to nonclients in nonadversarial contexts, it was reasonable for ALPS to apply this test to the factual scenario at hand. Accordingly, we conclude that ALPS had "a reasonable basis in law" under § 33-18-242(5), MCA, for contesting Redies' claims against Addy.

¶56 Redies points out that the authors of the December 4, 2001 evaluation commissioned by ALPS "discounted" the privity defense before ALPS denied Redies'

28

claims and "accurately predicted" that this defense would not prevail. Thus, she argues, it was unreasonable for ALPS to contest her claims against Addy on the ground that he owed her no duty.

¶57 The legal advice which informed ALPS's decision to contest Redies' claim is relevant to whether that decision was grounded in "a reasonable basis in law." Had ALPS received advice that Addy owed Redies a duty under the existing law, this would be a different case. As it is, however, the evaluation authors' ultimate assessment was that "sufficient questions exist as to the issue of liability so that we believe it is not reasonably clear." And on the privity issue in particular, they stated that "absent a direct attorney-client relationship between [Redies] and [Addy], no action should be allowed." Their acknowledgement that "there have been challenges in the past as to this privity requirement" and their speculation that "our court may . . . simply find[] that the relationship between the protected person and the conservator's attorney [is] close enough to allow suit" did not render ALPS's subsequent argument based on the *Trask* test unreasonable under § 33-18-242(5), MCA.

¶58 We therefore affirm the District Court's conclusion that ALPS had a reasonable basis in law for contesting Redies' claims against Addy. We now turn to the question of whether, given this outcome, any genuine issues of material fact remain.

## V. Factual Issues

¶59 Redies asserts that a number of factual issues precluded granting summary judgment in this case. First, as described earlier, the District Court reasoned that "an adversarial situation" existed between Redies and Uerling and, thus, that Addy did not

29

owe Redies a fiduciary duty during the months immediately following her accident. Redies maintains that whether any of the relationships relevant to the issues herein were "adversarial" presents a factual issue. Second, the District Court also reasoned that Redies' interests "should have been protected by her own attorney," which presumably is a reference to Dunaway. Redies asserts that whether Dunaway acted as her attorney during that time period (aside from Dunaway's brief role as attorney ad litem) and whether Cosner relied on Dunaway for advice in managing the conservatorship were issues of fact precluding summary judgment. Finally, Redies argues that whether Addy acted only as the attorney for Cosner, as conservator, or whether, by his statements and actions, he created an attorney-client relationship with Redies and her estate presents a factual issue. However, given our conclusion that ALPS had a reasonable basis in law for contesting Redies' claims against Addy, resolution of these factual issues is unnecessary.

¶60     With respect to Redies' "pretext" claim, she points out that the authors of the December 4, 2001 evaluation commissioned by ALPS stated that they "do not put a great deal of stock in this privity defense." Thus, she argues, there is a factual dispute over "whether ALPS actually relied upon the 'no privity' defense, or whether that defense was asserted primarily to delay and increase the expense in prosecuting Ms. Redies' legitimate claim." Redies raised this issue in the District Court in response to ALPS's summary judgment motion; however, the court did not rule on it explicitly. Nevertheless, we observe that one of the theories advanced by ALPS in the underlying suit (on Addy's behalf) came straight out of *Rhode*, and, as explained above, it was reasonable for ALPS

to apply this precedent (and the *Trask* multi-factor balancing test recited in *Rhode*) to the factual scenario at hand. Thus, we conclude that Redies' "pretext" claim lacks merit.

¶61 Redies also argues that, irrespective of our decision with respect to her § 33-18-201(6) claim, a trial is still necessary on her § 33-18-201(4) claim. She points out that in *Shilhanek v. D-2 Trucking, Inc.*, 2003 MT 122, 315 Mont. 519, 70 P.3d 721, we held that the insurer had a reasonable basis in law for asserting that it was entitled to condition its payment of policy limits on the plaintiffs' providing it with a release of all claims against its insureds, *Shilhanek*, ¶ 30, but that a factual issue remained as to whether the insurer had refused to make advance payments to the plaintiffs to cover their medical expenses without first conducting a reasonable investigation, *Shilhanek*, ¶¶ 34, 36-37. Thus, she maintains, even if ALPS had a reasonable basis in law for contesting her claims against Addy, a factual issue remains as to whether ALPS refused to pay her claims "without conducting a reasonable investigation," § 33-18-201(4), MCA.

¶62 Redies misapprehends our disposition of the subsection (4) and subsection (6) claims in *Shilhanek*. As ALPS points out, the question of whether the insurer had violated its duty to make advance payments of medical expenses—a duty the insurer did not dispute it had—was separate from the question of whether it had a reasonable basis in law for refusing to pay policy limits without a release. *Compare Shilhanek*, ¶¶ 24-31, *with Shilhanek*, ¶¶ 34-37. In the case at hand, by contrast, the alleged subsection (6) violation (that ALPS "neglect[ed] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability ha[d] become reasonably clear") and the alleged subsection (4) violation (that ALPS "refuse[d] to pay claims without conducting a

31

reasonable investigation based upon all available information") are intertwined. At the time ALPS denied Redies' claims, the record discloses that it had investigated the facts and obtained an evaluation of its options under the law applicable to those facts. This research, ultimately, formed the basis for Addy's defense in the underlying action—namely, that under *Rhode* and the *Trask* test he did not owe a duty to Redies. Thus, the question of whether ALPS conducted a reasonable investigation before refusing to pay Redies' claims is resolved by ALPS's "reasonable basis in law" defense under § 33-18-242(5), MCA.

## CONCLUSION

¶63    The District Court correctly concluded that ALPS had a reasonable basis in law for contesting Redies' claims against Addy and that there were no genuine issues as to any material facts. Accordingly, we affirm the District Court's conclusion that ALPS was entitled to a judgment as a matter of law.[6]

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS

---

[6]Given this conclusion, we deem Redies' claim that the District Court abused its discretion by deciding ALPS's motion for summary judgment without ruling on her motion under M. R. Civ. P. 56(f) and without affording her "a fair opportunity to complete discovery" moot.

32

Justice Jim Rice, concurring.

¶64   I concur with the Court's decision herein.

¶65   The Court's Opinion notes that "we must step into ALPS's shoes" during the period of negotiations with Redies, that being July 2001 through December 2002, and analyze ALPS's actions as of that time. Then, following its analysis, the Court concludes that ALPS had a reasonable basis in law to contest Redies' claims against Addy "at the time it was made."

¶66   I agree with these statements but write only to clarify that, in 2001-02, ALPS was defending Addy against allegations he committed malpractice in 1995. Redies' complaint asserted that Addy negligently failed to recommend or establish a self-sufficiency trust under the circumstances that existed immediately following her bicycling accident which occurred in 1995. *See* ¶ 15. Redies claimed that Addy committed malpractice by failing to research and take advantage of statutes as they existed in 1995. Obviously, if 1995 law had not allowed the creation of a self-sufficiency trust, there could be no claim against Addy for failing to recommend or establish one.

¶67   Thus, in defending against Redies' malpractice claim, Addy was entitled to have his actions judged in accordance with the law in effect at the time he acted, in 1995. He, with ALPS defending him, was entitled to argue to a jury (if factual issues precluded summary judgment) or to a judge that, under the law as it existed at the time, he had committed no malpractice or he had no duty to Redies. He made this argument and, although it was rejected by Judge Baugh, the judge's order nonetheless concluded that

33

Addy owed a duty to Redies at the time "when he rendered legal advice to the conservator, Mr. Cosner," or 1995. This is as it should be.

¶68 Because Addy was entitled to be judged, in the underlying malpractice action, under the law as it existed when he acted, ALPS was likewise entitled, when defending its own actions taken in Addy's defense for purposes of the UTPA claim, to offer the law as it existed in 1995. To be sure, the law evolves, and the applicable law did evolve in the six years between Addy's actions and the filing of the claims against Addy. However, ALPS should not be judged solely by the law as it existed for purposes of an act of negligence committed in 2001. ALPS was entitled to make, within the UTPA action, the same argument Addy was entitled to make in the malpractice action, i.e., that it did not initially appear that Addy had a duty to Redies, based upon the state of the law in 1995. While the evolvement of the law in 1995 to 2001 is also relevant, the analysis of the law for Redies' claims properly begins as it existed in 1995. Consideration of the state of the law in 1995 demonstrates even more clearly that ALPS had a reasonable basis in law for initially denying the claims. As we note in the Opinion, it was not until our decision in *Rhode* in 1998 that "it was clear that an attorney *may* owe a duty to nonclients in some nonadversarial contexts." *See* ¶ 44 (emphasis in original). Addy's actions preceded *Rhode*'s signal that the law with regard to duty may be changing.

¶69 I concur.

/S/ JIM RICE

34

Justice Patricia O. Cotter dissents.

¶70    I dissent from the basic premise underlying the whole of the Court's Opinion, that being that Janet Redies is a mere "nonclient" or third-party beneficiary of Addy's legal services. I therefore dissent from all of the conclusions that flow from this premise.

¶71    Cosner was appointed by the District Court in 1995 to act as Redies' permanent conservator, in light of Redies' inability to handle her financial affairs and her personal arrangements. Opinion, ¶ 6. As we said in *In re Estate of Bayers*, 2000 MT 49, ¶ 14, 304 Mont. 296, ¶ 14, 21 P.3d 3, ¶ 14, "[c]onservatorship proceedings are established to promote the best interests of the protected person." As conservator, Cosner assumed the role of a fiduciary for Redies as the protected person. Section 72-5-423, MCA. In furtherance of the performance of his fiduciary duties, Cosner retained Addy to advise and assist him, as he was empowered to do under § 72-5-427(3)(w), MCA, and the two then met in September 1995 to determine how best to conserve and manage Redies' estate. ¶ 8. Once a management plan was developed pursuant to Addy's advice and counsel, Cosner proceeded to manage Redies' property in accordance with that plan, selling off her property and paying her debts until such time as Redies qualified for Medicaid and SSI coverage. ¶ 10.

¶72    During the early years that Addy advised Cosner concerning Redies' estate, he referred to himself variously as "I represent the Estate of Janet Redies" (December 1997 correspondence from Addy to Redies' creditors) and "Attorney for Ms. Redies" (Request for a Fair Hearing filed with the Department of Public Health and Human Services on May 30, 1997). No doubt other filings in this voluminous record reflect similar

35

representations. Matters between Redies on the one hand, and Cosner and Addy on the other, were not at all adversarial until 1998, when Redies had recovered sufficiently to question the disposition of her assets. ¶ 11. Thus, during the period in question—that being the time period during which Redies' estate was dissipated—Cosner was acting as a fiduciary for Redies, Addy was advising him how best to fulfill that function, and Addy was representing himself to third parties as Redies' attorney. And, significantly, Addy's services were being paid for **by Redies' estate.** Given these undisputed facts, it mystifies me that we could conclude, as did the District Court, that Redies was at best a third-party beneficiary to whom Addy did not owe a duty of professional care.

¶73 The Court errs in using *Watkins Trust v. Lacosta*, 2004 MT 144, 321 Mont. 432, 92 P.3d 620, as a template. In that case, the defendant attorney Lacosta was retained by Stanley and Carolyn Watkins to draft an estate plan for the two of them. Lacosta drafted their wills and a Revocable Trust Agreement (Trust). *Watkins Trust*, ¶¶ 6-7. It eventually became apparent that the instruments Lacosta drafted did not comport with Stanley's and Carolyn's wishes, and that the deficiencies in the instruments would have serious implications for Steve Williamson (Steve), the parties' son and the intended beneficiary of the Trust. *Watkins Trust,* ¶ 13. Ultimately, the Trust and Steve, individually and as Personal Representative of Stanley's Estate (Appellants), brought a legal malpractice suit against Lacosta, alleging negligence in her drafting of the Trust documents and Stanley's will. *Watkins Trust*, ¶ 1.

¶74 In addressing the question of whether the Appellants had standing to sue Lacosta, we looked at the relationship between Lacosta and each of them separately. First, we

found that, because Stanley had been Lacosta's client and was now deceased, the Estate stood in his shoes and had standing to sue Lacosta. *Watkins Trust,* ¶ 19. Steve's standing, however, presented a different question, in that he was claiming standing as a *nonclient beneficiary of the Estate.* We said that the duty owed to a nonclient beneficiary was a matter of first impression in Montana. *Watkins Trust*, ¶ 21. It was this analysis that the District Court fastened upon in its Order, concluding it applied to the question of Addy's duty to Redies (Opinion, ¶ 24) and it is this same analysis that underpins this Court's erroneous conclusions in ¶¶ 53-58 to the same effect.

¶75 The difference between Steve's position vis-à-vis the defendant attorney Lacosta in the *Watkins Trust* case and Redies' position vis-à-vis Addy in this case is, to my mind, readily apparent. Steve was never Lacosta's client. Lacosta's duty of professional care ran to her clients, Testators Stanley and Carolyn, and not to Steve as the beneficiary. This is why the question of his standing was always framed as that of a *nonclient.* Here, by contrast, Addy was hired to serve Redies' best interests, and he was paid by her estate to perform this function. In short, Redies was Addy's client. We therefore err when throughout our analysis, we accept as correct the District Court's flawed presumption, and cast Redies as a nonclient on par with Steve in *Watkins Trust*.

¶76 The Court concedes there is some credibility to the position advocated here (see Opinion, ¶ 37), but ultimately rejects it because there is no Montana authority cited for the proposition that an attorney retained by a conservator to protect the interests of a protected person actually owes that person a duty of care. Indeed, there is no Montana authority on point, perhaps because the proposition is so obviously true that it has not

37

been litigated. I submit that the lack of authority for the proposition I advocate here neither renders it unsupportable, nor justifies ALP's rejection of Redies' claims—especially in light of the insurer's possession of correspondence in which Addy actually represented himself as Redies' attorney or the attorney for her estate. Moreover, I find it especially unfortunate that, while there is likewise no precedent for the position adopted by the Court here—i.e., that the attorney retained by the conservator owes no duty of care to the protected person—the Court has now supplied a precedent by which future litigants, and in particular "protected" persons, will be bound to their detriment.

¶77    If one accepts the premise that Redies was Addy's client and not a mere nonclient beneficiary of his work, then the entire foundation of the District Court's analysis and this Court's Opinion crumbles. And it should. We have in effect said here that an attorney hired and paid by one's estate to serve the best interests of an incapacitated person does not owe that person a direct duty of professional care. We have erred. I therefore dissent.

/S/ PATRICIA COTTER

Justice James C. Nelson dissents.

## I.    Introduction

¶78    I believe that the "first-party" theory of liability set forth in Justice Cotter's Dissent—that Redies was Addy's client—was the correct approach for analyzing Redies claims against Addy.  Thus, the contention that an attorney retained by a conservator does not also represent the protected person—though the attorney was retained specifically to advise or assist the conservator in the administration of the protected person's estate— was not "a reasonable basis in law" under § 33-18-242(5), MCA, for contesting the protected person's legal malpractice claim.  I therefore disagree with the Court's first-party analysis (¶¶ 37-38)—especially here, where Addy, while representing Cosner, signed a document as "Attorney for Ms. Redies" and stated in a letter to Redies' creditors that "I represent the Estate of Janet Redies."  *See* ¶ 72 of Justice Cotter's Dissent.  Indeed, ALPS should be bound by Addy's admissions.  For these reasons, I join Justice Cotter's Dissent.

¶79    Given this conclusion, it is not necessary to reach Redies' "third-party" theory of liability against Addy.  However, because the Court, in my view, makes a critical error in its analysis of ALPS's proffered defense under this theory, it is important to explain why the contention that an attorney retained by a conservator does not owe a duty of care to the protected person also was not "a reasonable basis in law" under § 33-18-242(5), MCA.  In this regard, I agree, for the most part, with the Court's preliminary discussion of this issue.  In particular, I agree that our decision depends on the legal landscape as it existed during the negotiations which took place in 2001 and 2002 (¶ 29); I agree that the

39

reasonableness of ALPS's defense is a question of law (¶¶ 30-35); I agree that *Watkins Trust v. Lacosta*, 2004 MT 144, 321 Mont. 432, 92 P.3d 620, does not dictate the outcome of this case (¶¶ 39-40); and I agree that an insurer's proffered defense (on behalf of its insured in the underlying action) is not reasonable *per se* just because this Court has not yet rejected the defense explicitly (¶¶ 41-43).

¶80 The point at which I part ways with the Court is its assessment of the legal landscape that existed in late-2001 and 2002. In my view, the Court improperly discounts the advanced progression of our caselaw toward holding a professional liable to third parties whose interests may be expected to be affected by the professional's negligent performance of a contract.

¶81 Furthermore, I disagree with the Court's assessment of ALPS's arguments under our then-existing precedents. Even if it was reasonable for ALPS to rely *solely* on the multi-factor balancing test set forth in *Trask v. Butler*, 872 P.2d 1080, 1083 (Wash. 1994), as a defense to Redies' third-party theory of liability against Addy, the Court errs in concluding that ALPS's actual application of that test was reasonable. To the contrary, ALPS's analysis (on Addy's behalf) was incomplete, contrary to the facts of this case, and thus *un*reasonable. I therefore do not agree that ALPS proffered "a reasonable basis in law" for contesting Redies' third-party theory, and I conclude that summary judgment in favor of ALPS was not proper in this case.

## II. ALPS's "Privity of Contract" Defense

¶82 In Addy's brief in support of his motion for summary judgment in the underlying suit, ALPS relied on two theories: "privity of contract" and the *Trask* test. With respect

to the former, it took the position that where the plaintiff is not in privity of contract with the defendant, she may not recover damages for the defendant's negligent performance of the contract. Translated to the case at hand: Because Redies was not in privity with Addy, whose contract to provide legal services (under this third-party theory) was with Cosner, she could not recover damages for his allegedly negligent performance of that contract (advising Cosner to pauperize Redies instead of recommending the establishment of a self-sufficiency trust). According to ALPS, "Mr. Addy acted as attorney for Mr. Cosner, the Conservator and Ms. Uerling, the Guardian. That was the extent of his attorney-client relationships in this matter."

¶83 Yet, twenty years before ALPS relied on this defense to Redies' claims against Addy, we observed that "[t]his Court was a pioneer in abolishing privity as a requirement for recovery in a personal injury or wrongful death case." *Hawthorne v. Kober Const. Co., Inc.*, 196 Mont. 519, 523, 640 P.2d 467, 469 (1982) (citing *Brandenburger v. Toyota Motor Sales, U. S. A., Inc.*, 162 Mont. 506, 513 P.2d 268 (1973)). We further stated:

> We have not felt permanently bound to archaic legal concepts no matter how deeply rooted they may be. We view privity to be a concept having proper application in the area of contract law. *There seems to be no sound public policy argument for extending its application to tort*.

*Hawthorne*, 196 Mont. at 523, 640 P.2d at 469 (emphasis added). We then went on to adopt the following rule enunciated in Prosser, *The Law of Torts* § 93, at 622, 623 (4th ed., West 1971):

> [B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not

41

negative the responsibility of the actor *when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.*

. . . .

. . . [T]here are situations in which the making of the contract creates a relation between the defendant and the promisee, which is sufficient to impose a tort duty of reasonable care. By the same token, there are situations in which the making of a contract with A may create a relation between the defendant and B, which will create a similar duty toward B, and may result in liability for failure to act. [Emphasis added, footnote omitted.]

*See Hawthorne*, 196 Mont. at 523-24, 640 P.2d at 470 (quoting the foregoing text from Prosser, *The Law of Torts* § 93).

¶84 Consistent with *Hawthorne*, we have rejected the privity of contract defense in a variety of contexts. *See*, *e.g.*, *Tynes v. Bankers Life Co.*, 224 Mont. 350, 359-60, 730 P.2d 1115, 1121 (1986) (insurer liable in tort to insured's father, notwithstanding the absence of privity (quoting Prosser's rule)); *Thayer v. Hicks*, 243 Mont. 138, 149, 793 P.2d 784, 791 (1990) (accountant liable to third parties who he knows intend to rely upon his work product); *Jim's Excavating Service v. HKM Assoc.*, 265 Mont. 494, 502, 506, 878 P.2d 248, 253, 255 (1994) (project engineer or architect liable to third parties who foreseeably may rely on the information supplied by the engineer or architect (quoting Prosser's rule)); *Turner v. Kerin & Associates*, 283 Mont. 117, 125-26, 938 P.2d 1368, 1373-74 (1997) (engineering firm liable to any party who holds or succeeds to a security interest in the property serviced by the firm (quoting Prosser's rule)).

¶85 Thus, by 2001, it was firmly established in our caselaw that the requirement of privity of contract to maintain an action in tort had been abolished. Indeed, in *Jim's*

*Excavating* we rejected the defendant's privity argument precisely because it ignored "the *established* law in Montana abolishing the requirement of privity of contract to maintain an action in tort." *Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253 (emphasis added). And attorney malpractice actions were no exception. In *Rhode v. Adams*, 1998 MT 73, 288 Mont. 278, 957 P.2d 1124, we observed that an attorney may owe a duty to someone other than his or her client, at least in nonadversarial contexts. *See Rhode*, ¶¶ 12-17. This observation was consistent with our adoption of Prosser's rule in *Hawthorne* (though we did not cite Prosser in *Rhode*), and it confirmed that privity of contract is *not* required to maintain a malpractice action against an attorney.

¶86 It is not surprising, therefore, that none of the authorities proffered by ALPS in the underlying action supports the argument that privity—notwithstanding our consistent and repeated rejections of the concept in *Hawthorne*, *Tynes*, *Thayer*, *Jim's Excavating*, *Turner*, and *Rhode*—was, nevertheless, still required to maintain an attorney malpractice action. ALPS cited *Grenz v. Prezeau*, 244 Mont. 419, 798 P.2d 112 (1990), in Addy's motion for summary judgment, for the proposition that "[e]ssential to a malpractice action is proof that an attorney-client relationship existed." On appeal, ALPS cites *Stott v. Fox*, 246 Mont. 301, 805 P.2d 1305 (1990), and *Carlson v. Morton*, 229 Mont. 234, 745 P.2d 1133 (1987), for the same proposition. But *Grenz*, *Stott*, and *Carlson* do not stand for a rule that a plaintiff must have "privity of contract" with the defendant-attorney in order to maintain a malpractice action.

¶87 To the contrary, we stated in *Carlson* that "[i]n any professional negligence action, the plaintiff must prove that the professional owed him *a duty*, that the professional failed

43

to live up to that duty, thus causing damages to the plaintiff." *Carlson*, 229 Mont. at 238,

745 P.2d at 1136 (emphasis added). Quoting some of this language from *Carlson* in

*Merzlak v. Purcell*, 252 Mont. 527, 830 P.2d 1278 (1992), we explained as follows:

> Attorney malpractice is professional negligence. In order to recover in a professional negligence action, "the plaintiff must prove that the professional owed him *a duty*, and that the professional failed to live up to that duty, thus causing damages to the plaintiff."

*Merzlak*, 252 Mont. at 529, 830 P.2d at 1279 (emphasis added) (quoting *Lorash v.*

*Epstein*, 236 Mont. 21, 24, 767 P.2d 1335, 1337 (1989), in turn quoting *Carlson*, 229

Mont. at 238, 745 P.2d at 1136); *accord Hauschulz v. Michael Law Firm*, 2001 MT 160,

¶ 11, 306 Mont. 102, ¶ 11, 30 P.3d 357, ¶ 11 ("To recover damages in a legal malpractice

claim, a plaintiff must establish each of the following elements: first, that the

professional owed him *a duty of care*; . . . ." (emphasis added) (citing *Merzlak*, 252 Mont.

at 529, 830 P.2d at 1279)).

¶88    Thus, our statement in *Grenz*, 244 Mont. at 426, 798 P.2d at 116, and *Stott*, 246

Mont. at 305, 805 P.2d at 1307, that a plaintiff in a legal malpractice action must

establish that "an attorney-client relationship" existed was not a resurrection of the long-

discarded requirement of privity of contract. Rather, it was another way of stating that

the plaintiff must establish that the defendant owed her a duty of care. Notably, ALPS

effectively conceded this point in the underlying action. Immediately after asserting in

Addy's summary judgment motion that "[e]ssential to a malpractice action is proof that

an attorney-client relationship existed," ALPS went on to explain as follows: "*Put*

*another way*, the Plaintiff must establish that the professional owed him a duty of care."

(Emphasis added, citing *Hauschulz*.)  Therefore, the flaw in ALPS's position that Addy had no duty to Redies (because he was retained by Cosner) was the mistaken premise that "attorney-client relationship" means "privity of contract."  To the contrary, as our then-existing caselaw established, the requirement of privity to maintain an action in tort had been abolished.  Accordingly, a defense that used the long-discarded concept of privity as a template was *not* "a reasonable basis in law" for contesting Redies' third-party theory.

### III.    Three Approaches for Ascertaining Duty to Third Parties

¶89    The specific question ALPS faced in evaluating Redies' third-party theory of liability against Addy, therefore, was not whether the two of them were in privity but, rather, whether he owed her a duty of care.  In this regard, having acknowledged that "[s]ome courts . . . have extended the duty of an attorney to certain non-clients," ALPS proffered a second theory in support of Addy's motion for summary judgment—namely, that such a duty should not be extended to a protected person in a conservatorship.  As support for this position, ALPS relied solely on the *Trask* multi-factor balancing test.  Yet, given our equivocal language in *Rhode*—specifically, that "a multi-factor balancing test, such as that set out in *Trask*, *may* be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice," *Rhode*, ¶ 17 (emphasis added)—it was not reasonable for ALPS to ignore completely, as it did, then-existing alternative approaches for ascertaining the duty of care owed by a professional to third parties.

¶90    Again, the rule enunciated by Prosser and adopted by this Court in *Hawthorne* provides as follows:

[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured.  The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.

Prosser, *The Law of Torts* § 93, at 622.  Given our reaffirmations of this rule in *Tynes*, 224 Mont. at 359-60, 730 P.2d at 1121, *Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253, and *Turner*, 283 Mont. at 125-26, 938 P.2d at 1373-74, it cannot be disputed that the rule was firmly established in our caselaw by 2001.

¶91    However, we have not always invoked Prosser's rule for ascertaining whether a professional owed a duty of care to a nonclient.  For instance, in *Thayer*, we considered three different approaches for determining the extent of an accountant's duty of care to third parties:  "The first approach limits the duty of care to those third parties who are *actually known* to the accountant, the second limits the duty to those who are *actually foreseen* and the third expands the duty to all those who are *reasonably foreseeable*."  *Thayer*, 243 Mont. at 144, 793 P.2d at 788 (emphases added).  Ultimately, given the facts of the case, we applied a modified version of the first approach:

[An accountant's duty of care to third parties with whom he is not in privity of contract] exists only if the accountant *actually knows* that a specific third party *intends to rely* upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product.

*Thayer*, 243 Mont. at 149, 793 P.2d at 791 (emphases added).  Notably, this approach is consistent with Prosser's observation that the incidental fact of the existence of a contract between the defendant and A does not negative the defendant's responsibility when he

enters upon a course of affirmative conduct "which may be expected to affect the interests of another person." Prosser, *The Law of Torts* § 93, at 622.

¶92     With respect to attorneys, we stated in *Rhode* that "a multi-factor balancing test, such as that set out in *Trask*, may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice." *Rhode*, ¶ 17. (We further clarified that "this model is not appropriate to define an attorney's duties while representing clients in adversarial proceedings." *Rhode*, ¶ 17.) Yet, while we did not identify *Thayer* or Prosser's rule in *Rhode*, we did not reject these approaches either. Thus, for the purpose of ascertaining in 2001 and 2002 whether an attorney owes a duty of care to a nonclient, our long-standing endorsement of Prosser's rule and our actual-knowledge-of-intent-to-rely approach in *Thayer* were still essential considerations.

¶93     Indeed, when we ultimately held in *Watkins Trust* that a drafting attorney owes a duty to nonclient beneficiaries named in the drafted instrument, we cited cases representing all three approaches. Specifically, we explained that "a finding of duty is consistent with existing Montana law," and we cited *Rhode* (the *Trask* multi-factor balancing test), *Jim's Excavating* (Prosser's rule), *Turner* (Prosser's rule), and *Thayer* (the actual-knowledge-of-intent-to-rely approach), as examples. *Watkins Trust*, ¶ 22.

¶94     For these reasons, I cannot agree that ALPS proffered "a reasonable basis in law" for contesting Redies' claims against Addy by relying on one of these approaches and completely ignoring the other two—particularly since the approach relied on by ALPS was the very one we had not actually adopted, having stated merely that it "may" be effective for ascertaining the duty owed by an attorney to a nonclient. (Indeed, at the

47

outset of applying the *Trask* test in Addy's motion for summary judgment, ALPS acknowledged that "the Supreme Court has not unequivocally adopted the multi-factor balancing test.") Moreover, we had already applied Prosser's rule, which is stated in general terms, in a variety of contexts.

## IV.    ALPS's Application of the *Trask* Test

¶95    But even if it was reasonable for ALPS to rely on just the *Trask* multi-factor balancing test as a defense to Redies' third-party theory of liability, ALPS's actual application of that test did not constitute "a reasonable basis in law" for contesting her claims.

¶96    As we explained in *Rhode*, the multi-factor test involves a balancing of six factors: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability. *Rhode*, ¶ 14 (quoting *Trask*, 872 P.2d at 1083). (This test can be traced to *Lucas v. Hamm*, 364 P.2d 685, 687-88 (Cal. 1961).) We further explained that the important inquiry under the multi-factor balancing test is "whether the attorney's services were intended to affect the plaintiff." *Rhode*, ¶ 14; *see also Trask*, 872 P.2d at 1083.[1]

---

[1] Notably, the first four *Trask* factors mirror the two primary considerations set forth in Prosser's approach—namely, the nature of the relationship between the defendant and the third party (Did the defendant, by entering into a contract with A, place himself in such a relation toward B that that law will impose upon him an obligation to act in such a

48

¶97 In Addy's motion for summary judgment, ALPS argued that "[a]lthough the Supreme Court has not unequivocally adopted the multi-factor balancing test, it is clear that even if it was applied, there would be no liability to Janet Redies under these circumstances." ALPS then proceeded to apply the *Trask* test, as follows.

¶98 First, with respect to factor (1)—the extent to which the contract between Addy and Cosner was intended to affect Redies—ALPS argued that "Redies was an incidental beneficiary, a relationship not close enough to satisfy that aspect of the multi-factor balancing test." But how could Redies—the protected person in the conservatorship— possibly have been a mere "incidental" beneficiary when Addy was retained by Cosner specifically to render legal advice concerning the management and administration of Redies' estate? ALPS's assertion is preposterous, to say the least.

¶99 Section 72-5-427(3)(w), MCA, states:

> A conservator, acting reasonably *in efforts to accomplish the purpose for which he was appointed*, may act without court authorization or confirmation to . . . employ persons, including *attorneys*, auditors, investment advisors, or agents, even though they are associated with the conservator, *to advise or assist him in the performance of his administrative duties*; *act upon their recommendation without independent investigation*; and instead of acting personally, employ one or more agents to perform any act of administration, whether or not discretionary . . . . [Emphases added, paragraph break omitted.]

That is precisely what took place here.

¶100 Indeed, in April 2002, Cosner completed an affidavit in which he stated that "Mr. Addy assisted me in performing my duties as temporary conservator, and later as

way that B will not be injured?), and the degree of certainty that the defendant's conduct would affect the third party's interests (Did the defendant enter upon a course of affirmative conduct which may be expected to affect the interests of B?).

permanent conservator, as those duties are established under Montana law." Cosner further stated that "in my capacity as temporary and permanent conservator, I relied on Mr. Addy's counsel and advise [sic] in performing my duties," and "I relied on Mr. Addy's advice and recommendations on handling Ms. Redies' estate, as evidenced and set forth in Mr. Addy's letter of September 7, 1995." (That is the letter in which Addy memorialized the management plan. *See* ¶ 9 n.2 of the Court's Opinion.) Finally, and most significantly, Cosner concluded his affidavit with the following statement: "During the period [of] time I served as Ms. Redies' temporary and permanent conservator of Ms. Redies' estate, *I did not retain Mr. Addy as my attorney for any purpose, personal or business*, other than as identified above." (Emphasis added.)

¶101 Addy never disputed that his services were retained by Cosner for the sole and specific purpose of advising Cosner regarding the management of Redies' estate. Notably, Addy's bills for legal services were paid not by Cosner, but by Redies' estate. Thus, it was disingenuous to say the least—and perhaps even a flat-out misrepresentation of the facts—for ALPS to assert that Redies was a mere "incidental" beneficiary of Addy's contract with Cosner. To the contrary, the record firmly establishes that Addy's services were *intended* to affect Redies.

¶102 Next in its analysis, ALPS omitted any discussion of factors (2) and (3)—the foreseeability of harm to Redies, and the degree of certainty that Redies suffered injury, respectively—both of which weigh heavily in favor of finding a duty of care. ALPS instead skipped ahead to factor (4)—the closeness of the connection between Addy's conduct and the injury suffered by Redies. In this regard, ALPS argued as follows: "Mr.

50

Addy had no authority to act on his own with regard to the Estate of Janet Redies. The only person with that legal authority was the Conservator, Mr. Cosner." Thus, "Mr. Addy could not have performed any acts which were improper or caused harm to her since Mr. Addy's actions take form only through the actions of the Conservator." ALPS suggested that Redies' proper and exclusive remedy was to sue Cosner.

¶103 Aside from the fact that this appears to be another privity argument, ALPS's contentions were contrary to the record. Given that Cosner retained Addy solely and specifically to render legal advice concerning the management and administration of Redies' estate, and given that Cosner in fact "relied on Mr. Addy's advice and recommendations on handling Ms. Redies' estate," there clearly was a close connection—indeed, a direct conduit—between Addy's conduct and Redies' injury. Addy not only should have known, but in fact *did* know, that Cosner would be acting upon Addy's recommendations, as Cosner was authorized to do by § 72-5-427(3)(w), MCA.

¶104 Moreover, it was absurd to suggest that Addy could hide behind Cosner under these circumstances. Cosner hired Addy precisely because he (Cosner) did not have the legal expertise to make certain administrative decisions concerning Redies' estate. Addy could not be shielded from liability to Redies simply because it was Cosner—and not Addy—who implemented Addy's advice and recommendations. (In this regard, it is not at all clear that Addy in fact did *not* have "authority to act on his own with regard to the Estate of Janet Redies," given that § 72-5-427(3)(w), MCA, authorizes a conservator to "employ one or more agents to perform any act of administration, whether or not

51

discretionary.")  Thus, ALPS's assertion that "Addy had no authority to act on his own," even if true, was both misleading and irrelevant.

¶105   Next, as with factors (2) and (3), ALPS omitted any discussion of factor (5)—the policy of preventing future harm, which also weighs in favor of finding a duty of care— and focused the remainder of its analysis on factor (6)—the extent to which the legal profession would be unduly burdened by a finding of liability.  According to ALPS:

> Where a duty to a non-client creates a risk of divided loyalties because of conflicting interests, those considerations against finding duties to a non-client outweigh the other considerations.  *Trask*, 872 P.2d at 1085.  It is from this general rule that the *Rhode* court extracted its determination that there should not [be] a duty to a non-client where there are potentially adversarial proceedings.
>
> That is truly the case here.  There are currently adversarial proceedings between Janet Redies and her attorneys and Mr. Cosner, the Conservator, and his attorneys, including Mr. Addy.  To hold Mr. Addy had duties to Janet Redies in addition to those of Mr. Cosner would create an irresolvable conflict of interest and division of loyalties for him.

ALPS also suggested that an "inherent conflict" exists between a protected person and the attorney retained by her conservator.

¶106   In *Rhode*, the adversarial proceeding which precluded a finding of duty was a contested child custody case, wherein the defendant-attorney represented one of the parents.  *Rhode*, ¶¶ 3-8.  We concluded that "if an attorney owes the same duty of care to both the parent and the children, he or she will be able to serve neither effectively." *Rhode*, ¶ 21.  In *Trask*, the adversarial proceeding which precluded a finding of duty was an attorney's representation of the personal representative of an estate.  *Trask*, 872 P.2d at 1081-82.  The court concluded that a duty is not owed from an attorney hired by the

52

personal representative of an estate to the estate or to the estate beneficiaries, in part because "[a] conflict of interest arises in estate matters whenever the interest of the personal representative is not harmonious with the interest of an heir" and, thus, "the unresolvable conflict of interest an estate attorney encounters in deciding whether to represent the personal representative, the estate, or the estate heirs unduly burdens the legal profession." *Trask*, 872 P.2d at 1085.

¶107 In the case at hand, by contrast, there was no conflict of interest whatsoever between Cosner and Redies; in fact, Redies initially was comatose and then remained incapacitated at least until 1998, when she began to question the disposition of her assets. (In this regard, ALPS's reliance on adversarial relationships that developed in 1998— three years *after* Addy had advised Cosner to pauperize Redies—is misplaced.) Had the opposite been true and an adversarial relationship *had* existed between Cosner and Redies, then he could not have served as her conservator. *See* §§ 72-5-423, 72-34-105, MCA. Thus, given the nature and purpose of a conservatorship—particularly, the fact that the interest of the conservator and the interest of the protected person are, by definition, harmonious—Addy simply could not have faced an irresolvable conflict of interest in representing Cosner and Redies simultaneously. ALPS's argument that the existence of a duty to Redies "would create an irresolvable conflict of interest and division of loyalties" for Addy was not only contrary to the foregoing statutes and devoid of merit, but also unreasonable.

¶108 In my view, a reasonable application of the *Trask* factors, in conjunction with Prosser's rule, leads to only one conclusion—that Addy owed Redies a duty of care.

First, "in efforts to accomplish the purpose for which he was appointed," Cosner employed Addy "to advise or assist him in the performance of his administrative duties." *See* § 72-5-427(3)(w), MCA. This same provision authorized Cosner to "act upon [Addy's] recommendation without independent investigation." Section 72-5-427(3)(w), MCA. It cannot be disputed, therefore, that Addy's services "[were] intended to affect the plaintiff [Redies]." (Factor 1.) *Rhode*, ¶ 14; *Trask*, 872 P.2d at 1083.

¶109 Likewise, it was certainly foreseeable that Redies would suffer harm—indeed, the type of harm that she in fact suffered here—if Addy advised or assisted Cosner negligently in the administration of Redies' estate. (Factors 2 and 3.) And, as explained above, there was a direct connection between Addy's conduct and Redies' injury, since Cosner retained Addy to render legal advice concerning the administration of Redies' estate and since Cosner, in fact, acted upon Addy's advice and recommendations. (Factor 4.)

¶110 Next, given that a conservatorship exists "to promote the best interests of the protected person," *In re Estate of Bayers*, 2001 MT 49, ¶ 14, 304 Mont. 296, ¶ 14, 21 P.3d 3, ¶ 14 (citing § 72-5-401 to -439, MCA), the policy of preventing the type of harm suffered by Redies from occurring to protected persons in the future weighs heavily in favor of a duty of care. (Factor 5.) Finally, a finding of liability would not unduly burden the legal profession. (Factor 6.) Indeed, the legitimate interests of a conservator are inseparable from those of the protected person. *Cf. In re Guardianship of Karan*, 38 P.3d 396, 401 (Wash.App. Div. 3 2002) (determining, under the *Trask* factors, that an attorney retained by a guardian owes a duty of care to the ward).

¶111 The record before us establishes that the *raison d'etre* for Addy's providing legal advice to Cosner was to benefit Redies; Addy's professional relationship with Cosner had no other purpose. Accordingly, by entering into this legal services contract with Cosner, Addy placed himself in such a relation toward Redies that the law imposed upon him an obligation, sounding in tort and not in contract, to act in such a way that Redies would not be injured. The incidental fact that Addy was retained by Cosner, and not by Redies personally, did not negative Addy's responsibility when he entered upon a course of affirmative conduct which clearly was expected—indeed, was *intended*—to affect Redies' interests. This was the established law in 2001 and 2002; and under this established law, the inevitable conclusion is that Addy owed Redies a duty of care.

## V.    ALPS's Reliance on *Watkins Trust*

¶112 ALPS makes much of the fact that in *Watkins Trust*, we noted that "[t]he duty owed [by an attorney] to a nonclient beneficiary is *a matter of first impression* in Montana." *Watkins Trust*, ¶ 21 (emphasis added). However, ALPS construes this language to mean something more than it did. A "case of first impression" is "[a] case that presents the court with issues of law that have not previously been *decided* in that jurisdiction." *Black's Law Dictionary* 206 (Bryan A. Garner ed., 7th ed., West 1999) (emphasis added). Thus, while we suggested in *Rhode* that an attorney, in nonadversarial contexts, may owe a duty to third persons to exercise care in the performance of services for his or her client, *see Rhode*, ¶¶ 12, 17, we actually found such a duty in *Watkins Trust* as "a matter of first impression"—notably, relying on *Rhode* in the process, *see Watkins Trust*, ¶¶ 21-22.

¶113 More to the point, the question here is not whether we had previously "decided" the defense proffered by ALPS in contesting Redies' third-party theory of liability. Rather, as the Court observes in ¶ 43, the determinative question is whether that defense was "reasonable" under our then-existing precedents, given the progression in our caselaw toward holding an attorney liable to certain nonclients (as we finally did in *Watkins Trust*). For the reasons set forth above, the answer to this question is "No." Our caselaw as of 2001 and 2002—including *Thayer*, *Jim's Excavating*, *Turner*, and *Rhode*—unmistakably foreshadowed our holding in *Watkins Trust*; the only thing remaining at that point in time was for us to make the holding explicit, as we might well have done in Redies v. Addy, had the case been taken to trial and appealed to this Court.

¶114 Indeed, in the same way that *Thayer* and *Jim's Excavating* announced new rules with respect to accountants and engineering firms, respectively, Redies v. Addy could have been the *Watkins Trust* case with respect to attorneys, had the parties not settled. Our cases certainly were headed in that direction. For this reason, although this Court had not yet found a duty running from an attorney to a nonclient by 2001 and 2002, ALPS nonetheless, in evaluating Redies' claims against Addy and deciding whether to contest those claims, had to weigh the likelihood that the District Court would find such a duty under our then-existing precedents (as Judge Baugh ultimately did) and that this Court would affirm that finding.

¶115 This is not to say that an insurer must accurately predict future holdings of this Court. Rather, it is an acknowledgement of the standard to which the insurer is held: reasonableness. As the Court notes in ¶ 41, a tort defendant and his or her insurer should

be able to test the scope and boundaries of legal duties, remedies, and defenses, but the insurer should not be immune from liability under the UTPA simply because this Court had not yet *explicitly* rejected the legal proposition on which the insurer relied in the underlying action. This is precisely the point of evaluating the *reasonableness* of the insurer's proffered defense.

¶116  Of course, if the law in 1995 had held that a conservator's attorney does *not* owe a duty to the protected person, then ALPS's no-duty defense would have been reasonable. Likewise, if the law in 1995 had not provided for the creation of a self-sufficiency trust, then Addy could not have been faulted for failing to establish one. As it is, however, ALPS could not rely on a definitive holding from this Court with respect to the duty owed by a conservator's attorney to the protected person. Thus, ALPS was required to evaluate pertinent then-existing precedents and base its decision on those cases, mindful of any handwriting on the wall. The reasonableness of that evaluation, in turn, dictates whether ALPS proffered "a reasonable basis in law" for contesting Redies' claims against Addy. As explained above, I conclude that ALPS's evaluation of our then-existing precedents was not reasonable.

## VI.    Conclusion

¶117  ALPS's assertion in the underlying action that Addy did not owe Redies a duty of care was not "a reasonable basis in law" on which to contest her third-party theory of liability. First, ALPS relied on the outdated "privity of contract" concept, which we had rejected in at least five cases over the 20-year period prior to 2001 and 2002, and which we had rejected with respect to attorneys, in particular, in 1998 in *Rhode*. ALPS was

57

apprised of this fact in the evaluation it received a week before denying Redies' claims.

Specifically, ALPS was told:

> As you know, however, there have been challenges in the past as to this privity requirement. Most of the erosion of the concept has occurred in connection with beneficiaries of wills being allowed to sue the attorney for the testator. To our knowledge, Montana has not decided the issue of whether a protected person might be able to sue the attorney of the conservator. Clearly, she could sue the conservator. Presumably, the conservator would have a right over against his attorney. Thus, our court may short circuit that process by simply finding that the relationship between the protected person and the conservator's attorney was close enough to allow suit.
>
> We do not put a great deal of stock in this privity defense, but it represents yet another problem the Plaintiff is going to experience in prosecuting her claim. *Given sufficient time and effort, we believe that defense can be circumvented.* [Emphasis added.]

¶118 In the face of this advice, ALPS nevertheless chose to put Redies through the "time and effort" of circumventing its privity defense—which she ultimately did when Judge Baugh ruled, correctly, in the underlying action that "Mr. Addy owed a duty to Ms. Redies when he rendered legal advice to the conservator, Mr. Cosner." ALPS's actions were contrary to "the declared public policy of this State to encourage settlement and avoid unnecessary litigation," *Augustine v. Simonson*, 283 Mont. 259, 266, 940 P.2d 116, 120 (1997) (citing *Holmberg v. Strong*, 272 Mont. 101, 106, 899 P.2d 1097, 1100 (1995)), and to the mandates of the Unfair Trade Practices Act, *see*, *e.g.*, § 33-18-201(6), MCA (prohibiting insurers from "neglect[ing] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear").

58

¶119 Second, three approaches existed in our caselaw in 2001 and 2002 for determining whether a professional owes a duty of care to a third party in the performance of a contract. Unfortunately, in defending against Redies' third-party theory of liability, ALPS relied on only one of these approaches—the *Trask* multi-factor balancing test. Furthermore, ALPS misapplied that test by ignoring three of the six factors and by making arguments (under the other three factors) that contradicted the actual facts of this case. As a result, ALPS reached the erroneous conclusion that Addy did not owe Redies a duty of care when he rendered legal advice to her conservator, Cosner. Had ALPS acknowledged that under our then-existing precedents, attorneys may be held liable to nonclients in certain situations (as it did), but then had merely cited the *Trask* test with no analysis whatsoever, I doubt that we would be reaching the result that the Court reaches today. I cannot fathom, then, how the Court can accept a patent *mis*application of the *Trask* test as "a reasonable basis in law" for contesting Redies' claims. ¶¶ 54-55.

¶120 Indeed, it contradicts the meaning of a "reasonable" basis in law defense to permit an insurer to proffer any argument—no matter how outlandish or lacking—as a basis for contesting the plaintiff's claim against its insured. To be sure, ALPS did not have to make the prevailing, or even a highly persuasive, argument under the *Trask* test; but it did, at the very least, need to apply that test in a reasonable manner, mindful of our adoption of other approaches in *Hawthorne*, *Tynes*, *Jim's Excavating*, *Turner*, and *Thayer*. Had it done so, it would have reached the correct conclusion that Addy owed Redies a duty of care. Instead, ALPS addressed only three of the six factors and, in that process, misstated the nature of the relationships at issue here and the purpose for which

Addy had been retained by Cosner. I therefore do not agree with the Court that ALPS's application of the *Trask* test satisfied § 33-18-242(5), MCA.

¶121 Because ALPS did not have "a reasonable basis in law" under § 33-18-242(5), MCA, for contesting Redies' claims against Addy—not only because Redies, in actual fact, was Addy's "client," as argued in Justice Cotter's Dissent, but also because Addy was liable under a third-party theory of liability—I conclude that ALPS was not entitled to judgment as a matter of law in the case at hand. I would reverse the District Court and remand this case for a trial on the merits of Redies' claims against ALPS. I dissent from the Court's contrary conclusion.

¶122 In closing, while I disagree with the Court's decision in this case, I trust that, based on the analysis preceding the Court's ultimate conclusion (and I agree with much of that analysis, as noted above), ALPS's privity argument is finally put to rest and will not be resurrected by a legal malpractice insurer in some future UTPA case. It should be clear, henceforth, that the "privity of contract" defense will no longer provide an insurer with a reasonable basis in law for denying or contesting a third-party legal malpractice claim, and that the determinative question in such cases is whether the attorney placed himself or herself in such a relation toward the third party that the law will impose upon him or her a duty, sounding in tort, to act in such a way that the third party will not be injured.

¶123 I dissent.

/S/ JAMES C. NELSON